Slip Op. 07 - 185

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————— :
AGRO DUTCH INDUSTRIES LIMITED,   :
                                  :
               Plaintiff,   :
                                  :
               v.   :   **Before: MUSGRAVE, Senior Judge**
                                  :   Court. No. 02-00499
UNITED STATES,   :
                                  :
               Defendant,   :
                                  :
               and   :
                                  :
COALITION FOR FAIR PRESERVED   :
MUSHROOM TRADE,   :
                                  :
         Defendant-Intervenor.  :
———————————————————— :

## OPINION AND ORDER

[On consideration of the results of redetermination of the second administrative review of mushrooms from India with respect to the plaintiff pursuant to court order by the U.S. Department of Commerce, International Trade Administration ("Commerce"), wherein Commerce again applied partial adverse facts available with respect to certain sales involving a customer of the plaintiff, matter again remanded for redetermination consistent with this opinion.]

Dated: December 26, 2007

    *Garvey Schubert Barer* (*Lizbeth R. Levinson*, *John C. Kalitka*, and *Ronald M. Wisla*) for the plaintiff.

    *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, Civil Division, United States Department of Justice, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Richard P. Schroeder*); International Office of Chief Counsel for Import Administration, United States Department of Commerce (*Matthew D. Walden*), of counsel, for the defendant.

    *Collier, Shannon, Scott, PLLC* (*Adam H. Gordon* and *Michael J. Coursey*) for the defendant-intervenor.

In Slip Op. 07-25 (Feb. 16, 2007), familiarity with which is presumed, the U.S. Department

of Commerce, International Trade Administration ("Commerce") was ordered to revisit the

application of partial adverse facts available on certain sales of the plaintiff Agro Dutch Industries,

Ltd. that first resulted in *Certain Preserved Mushrooms From India: Final Results of Antidumping

Duty Administrative Review*, 67 Fed. Reg. 46172 (July 12, 2002).  Now before the Court are the

Results of Redetermination Pursuant to Remand (May 3, 2007) ("*Remand Results*") reaffirming the

same application of partial adverse facts available to such sales and the parties' comments thereon.

As ordered, in the redetermination Commerce explains in greater detail its process of gathering

information with respect to the arrangement between Agro Dutch and "Customer A" and the impact

of the "negative credit period" transactions ("Set X" sales), the remaining sales between Agro Dutch

and Customer A ("Set Y" sales), and also sales from Agro Dutch to other customers for which

Customer A was to receive payment from such other customers ("Set Z" sales).

Generally, the theme of the *Remand Results* revolves around the determination that Agro

Dutch's questionnaire responses warranted an adverse inference during the administrative review

proceeding.  First, the remand results summarize that

> Agro Dutch reported to the Department in its initial questionnaire responses
> that it made all sales to the United States on a spot-sale basis and had no
> agreements with any U.S. customers. Agro Dutch told the Department that
> all sales to the United States were made with payment terms of 90 days after
> the bill of lading date and that it had reported the actual date of payment for
> all U.S. sales except for the sales unpaid as of the response submission date.
> Agro Dutch acknowledged that Customer A had a role different from other
> customers because it was a commissioned sales agent, but Agro Dutch
> offered no further information on its commission arrangements, although it
> was specifically requested to do so.

*Remand Results* at 4.

The *Remand Results* next describe the first supplemental questionnaire to Agro Dutch, wherein Commerce requested responses to the following:

> *Sales Process*
>
> 2.    Specify whether any sales agreement or contract exists between Agro Dutch and its U.S. customers.
>
> 3.    Specify whether or not Agro Dutch and its U.S. customers have any long-term or multi-purchase contracts or agreements. If so, provide copies of such agreements applicable to sales during the POR. . . .
>
> 38.0  Commissions
>
> 1.    Explain the basis of the commission rates paid to commissionaires. Provide more detail to explain what determines the rate paid on each sale. As examples, show how the commission was determined for sale observations 101 and 500. Provide copies to support how the commission was determined and paid.

*Id*. (summarizing Public Record Document ("PDoc") 80).

The *Remand Results* note that Agro Dutch responded that it "d[id] not have any binding contracts or agreements with any U.S. customers during the POR" because "[t]he quantities and prices of all sales are subject to change until the date of shipment." *Id*. (quoting PDoc 91 at 1, bracketing added). Regarding commissions, Agro Dutch explained that the relevant commissionaire involved in the sale of observations 101 or 500 was paid a commission based on a percentage of the cost-insurance-freight (CIF) value of sales booked by a certain entity, or if the sale had been "discounted by using the Letter of Credit" from Customer A, then based on the free-on-board (FOB) value of the sale, *id*. at 5, and the *Remand Results* state that "[t]his submission was the first time in this review that Agro Dutch attempted to describe this commission procedure" but that "Agro Dutch offered no further explanation regarding this arrangement." *Id*. at 4.

The *Remand Results* then state that the petitioner commented that the pattern of payment dates preceding shipment dates provided a "strong indication" that Agro Dutch had reported an incorrect year value in the "PATEDATEU" field of electronic data, that Agro Dutch's responses did not provide "any indication" of the extent of prepayment, and that "such prepayment would necessitate a long-term contractual obligation, and would undermine the date of sale currently reported by Agro Dutch." *Id*. at 5 (quoting Confidential Record Document ("CDoc") 30). The *Remand Results* note that Agro Dutch then responded

> the reported payment dates are correct. For the referenced observations, Agro Dutch has reported as the payment date the date that Agro Dutch received advances provided by [Customer A]. The cash advances were paid in anticipation of future shipments for which the customer, product and price were not determined at the time of the advance. [Customer A] arranged for certain U.S. sales on behalf of Agro Dutch and as reported in Agro Dutch's Section C questionnaire response, earned a commission of [*sic*] certain U.S. sales.

*Id*. (as quoting CDoc 34 at 2). The *Remand Results* characterize this response as providing "more detail about Agro Dutch's sales to Customer A than was previously disclosed" and highlighting "Agro Dutch's continued failure to fully explain its agreement with Customer A." They also state that

> [a]lthough Agro Dutch *maintained in previous submissions that it had no agreements of any kind* with any U.S. customer, this explanation indicated that, in fact, Agro Dutch and Customer A had some sort of agreement for which cash advances had been paid. The juxtaposition of this statement with the statement about Customer A's commissionaire role added to the apparent contradiction between Agro Dutch's statements that no agreements with customers existed, and all sales were made on a spot basis, and Agro Dutch's new statement implying that some sort of "agreement" or "understanding" was in place for which Customer A paid for its canned mushrooms in advance.

*Id*. (italics added).  The *Remand Results* then explain that for the preliminary results Commerce

concluded that it "was not able to determine the appropriate date of sale for the U.S. sales covered

by the agreement" because it had "observed a significant number of sales made to Customer A with

payment dates prior to the shipment date" (*i.e.*, the Set X sales).  *Id*.  Additionally, the *Remand*

*Results* state, "Agro Dutch's latest explanation regarding the advance payment was at odds with the

statements in its questionnaire responses that all sales were sold subject to payment within 90 days

of the bill of lading."  *Id*. at 5-6.

The *Remand Results* then explain that Commerce then issued a second supplemental

questionnaire on March 7, 2002, after publication of the preliminary results.  In it, Commerce

requested that Agro Dutch

> 1. Explain in detail the sales and payment terms for transactions involving
> payment advances, as identified on page 2 of the February 11, 2002,
> submission. In particular:
>
> a. Specify whether or not any type of written sales agreement or contract
> exists with regard to this customer. If so, provide the document(s). Explain
> why the agreements were not provided earlier in response to [Commerce's]
> questionnaire and supplemental questionnaire.
>
> b. Explain the apparent contradiction between the description of payment
> terms to this customer in the February 11 submission, and the statement at
> page C-12 of the May 25, 2001, response that all of Agro Dutch's U.S. sales
> are made with payment terms of 90 days after the bill of lading date.

*Id*. at 7 (quoting PDoc 129).

At this point, as described in the *Remand Results*, Agro Dutch explained that Customer A

had asked it to produce a customized product and had provided "advance payment deposits . . . in

effect as security for future sales of a new product."  Elaborating, Agro Dutch explained that

[t]here is no written agreement, only an oral understanding. Moreover, the advances were provided without regard to definite future sales. Indeed, the whole idea of the advance was to provide a form of security against future orders. There was no corresponding contemporaneous agreement to ship specific quantities to specific customers at specific prices.

As we began shipping A-1 mushrooms, and they were accepted by the ultimate customer, [Customer A] sought the quick return of its advance payments. We agreed to credit the deposits against sales of other products as well as A-1 mushrooms. In addition, we agreed to credit the advance payments against sales to other customers who would agree to pay the invoiced amounts to [Customer A] rather than to [Agro Dutch]. This enabled [Customer A] to recover its advance payments earlier. The invoices at issue note that the sale was made against advance payment, and where [Customer A] was not the customer, it is shown as the consignee. For these sales, [Customer A] collected payment from the ultimate customer. . . .

No written sales agreement or contract between [Agro Dutch] and any customer, including [Customer A] of any type was in effect during the POR or regarding sales made during the POR.

[Agro Dutch]'s standard payment terms are 90 days after bill of lading date, and these terms applied to all customers during the POR. With respect to the advance payments made by [Customer A], obviously the customer paid in advance and thus did not have 90 days to pay. For those sales to which the advance payments were applied, it would have been more accurate to state that the terms of payment were payment in advance. We apologize for any confusion this may have caused.

*Id*. at 7-8 (quoting PDoc 142 at 1-2).

The *Remand Results* state that Agro Dutch's explanation "threw into doubt" Commerce's assumptions concerning the nature of the sales as U.S. export price sales. *Id*. at 8. *Cf.* 19 U.S.C. §§ 1677a(a), 1677a(b). This was so, the *Remand Results* explain, because this was "the first time" Agro Dutch reported to Commerce that other customers pay Customer A for their purchases rather than Agro Dutch, and because Agro Dutch still "did not explain how or why its letter of credit was discounted on certain sales." *Id*. According to the *Remand Results*, this new information when

combined with Agro Dutch's previous "incomplete responses" purportedly "raised additional issues

which needed to be resolved[,]" specifically that

> [a]lthough Agro Dutch claimed that it was not affiliated with Customer A,
> Customer A's role as collection agent and consignee, in addition to
> commissionaire, may indicate a relationship equivalent to affiliation that
> would bear further examination and analysis to determine whether
> transactions involving Customer A were CEP sales, or even whether
> Customer A's sales to its customers, rather than Agro Dutch's sales to
> Customer A, should have been subject to our analysis.
>
> As Customer A acted as a collection agent, commissionaire, and consignee
> for some of Agro Dutch's sales to other customers, and its letter of credit was
> used to discount certain sales, Customer A may have been involved in the
> sales negotiation process. Customer A's interaction with Agro Dutch's other
> customers required further examination in order to determine whether any
> sales negotiations had been completed in the United States and thus whether
> these sales constituted CEP sales.
>
> Based on its explanation in [the second supplemental questionnaire
> response], for those sales where certain customers paid Customer A instead
> of Agro Dutch, Agro Dutch reported the payment date as the date of one of
> Customer A's payment advances, not the date the customer paid Customer
> A, nor the date Agro Dutch credited that customer's accounts receivable
> balance. Because the Department applied AFA [adverse facts available] to
> these sales, the Department did not address in the Final Results whether use
> of this reported payment date was appropriate for calculating imputed credit
> expense. Had the Department not applied AFA to these sales and instead had
> attempted to calculate a rate, it did not have the information necessary to
> calculate the imputed credit expense unless it accepted Agro Dutch's
> methodology.

*Id*. at 8-9.

The *Remand Results* then clarify that Commerce responded to Agro Dutch's response to its

second supplemental questionnaire as proof that Agro Dutch had "withheld" information and/or had

therefore "significantly impeded" the proceeding within the meaning of Section 1677e of Title 19,

United States Code, in its initial and/or supplemental questionnaire responses. *See* 19 U.S.C. §§

1677e(a)(2)(A), 1677e(a)(2)(C).  Hence, Commerce asserts that it was justified in resorting to facts

otherwise available and an adverse inference in the selection thereof.

Agro Dutch argues the matter must be remanded again.  The defendant-intervenors provided

no comment, while the government supports the *Remand Results* as is.  For the following reasons

the matter requires further remand.

### *Discussion*

### I

As a preliminary matter, the defendant's argument that Agro Dutch failed to exhaust

administrative remedies is without merit.  Also, the record does not contain substantial evidence to

support Commerce's characterization that "Agro Dutch maintained in previous submissions that it

had no agreements *of any kind* with any U.S. customer" and that "no agreements with customers

*existed*."  *E.g.*, *Remand Results* at 4 (italics added).  This is an inaccurate characterization of Agro

Dutch's earlier responses.   In the initial questionnaire, Commerce qualified its request for

"agreement(s)" with "your agreement(s) for sales in the United States."  *See* PDoc 20 at A-7.

Commerce did not specifically request information regarding Agro Dutch's "arrangement" with

Customer A in the initial questionnaire, unless that arrangement may be characterized as a "sales"

agreement; however, nothing in the record appears to contradict Agro Dutch's consistent responses

that it did not have a "sales" agreement with Customer A, and that all its sales, including those to

Customer A, are spot-sales at which point price and quantity are determined.  Thus, to the extent

Agro Dutch correctly characterizes its agreement with Customer A as other than a sales agreement,

Agro Dutch's initial questionnaire response was not untruthful.

Further, Agro Dutch did not "insist" in the first supplemental questionnaire that it did not have "any" agreements with its customers.  The first supplemental questionnaire asked Agro Dutch to "[s]pecify whether any sales agreement or contract exists between Agro Dutch and its U.S. customers" or whether "Agro Dutch or its customers have any long-term or multi-purchase contracts or agreements" and to provide copies of any.  Agro Dutch responded that it "d[id] not have any *binding* contracts or agreements with any U.S. customers during the POR" and that "[t]he quantities and prices of all sales are subject to change until the date of shipment." PDoc 91 at 1 (italics added). Agro Dutch did not provide a complete answer to the question asked, *see supra*, but it did not state that it did not have "any" agreements with its customers.  It merely stated that it did not have any "binding" agreements with its customers, whatever that implies.

Nonetheless, Commerce's characterizations amount to harmless error.  Among other things, section 1677e requires the use of facts otherwise available as a result of a respondent's "withholding" of information.  19 U.S.C. § 1677e(a)(2)(A).  The first supplemental questionnaire specifically asked for information concerning Agro Dutch's long-term or multi-purchase contracts without qualification. Agro Dutch responded with the qualification that it had no "binding" agreements.  Whether that statement is true, Agro Dutch could reasonably infer from the question asked that Commerce desired disclosure of whatever "arrangement" Agro Dutch had with Customer A.  Because Agro Dutch's response did not answer the question asked and was not unqualified, it was incomplete.  *Cf.* CDoc 20 *with* CDoc 47.   The record therefore contains substantial evidence to support the finding that Agro Dutch "withheld" information in accordance with subsection 1677e(a)(2)(A).  At this point, however, it is important to note that Commerce never made a

determination of whether Agro Dutch's arrangement with Customer A, as explained in the second

supplemental response, was in fact a "long-term or multi-purchase agreement."

II

When it becomes necessary to fill information gaps in the administrative record, the statutes

governing these type of proceedings require the use of facts otherwise available so that the

investigation or administrative review may proceed.  *See* 19 U.S.C. § 1677e(a).  However, any gap-

filling must later give way to actual information obtained during the course of the proceeding,

whether obtained pursuant to section 1677m(d) or received fulfilling the requirements of section

1677m(e).  *Cf.* 19 U.S.C. § 1677e(a) ("subject to" section 1677m(d)) *with* 19 U.S.C. §§ 1677m(d),

1677m(e).  Because Agro Dutch's previous responses to certain questions had been deficient for

purposes of the proceeding, Commerce sent a second supplemental questionnaire to Agro Dutch,

apparently pursuant to section 1677m(d).  That provision required Commerce to inform Agro Dutch

"of the nature of the deficiency," provide an opportunity "to remedy or explain" the deficiency in

light of the time limit for completing the review, and determine whether the response to the

deficiency notice, as embodied by Agro Dutch's second supplemental questionnaire, was timely and

satisfactory, or untimely or not satisfactory.[1]  The provision thus afforded Agro Dutch the

---

[1]  If a response is "not satisfactory," the information must still be considered if it satisfies the requirements of section m(e), which provides that Commerce shall not decline to consider information submitted by an interested party that is necessary to the determination but does not meet all applicable requirements established by Commerce if (1) the information is submitted by the deadline established for its submission, (2) can be (*i.e.*, is capable of being) verified, (3) is not so incomplete as to be unreliable, (4) the interested party acts to the best of its ability to provide the information and meet Commerce's requirements with respect to the information, and (5) can be used without undue difficulties.  19 U.S.C. § 1677m(e).  The deficiency of the response is not, by itself, a reason for rejecting other pertinent information therein.  *See* SAA at 865.  At any rate, a timely and
(continued...)

opportunity to cure the deficiency of its prior submission(s) prior to the completion of the proceeding.  If the deficiency was cured thereby, whatever reasons for its having been deficient earlier in the proceeding are rendered irrelevant, because there is now no longer a "gap" in the information necessary for the proceeding.

Commerce was thus required pursuant to section 1677m(d) to evaluate the four corners of Agro Dutch's second supplemental questionnaire response on its own merits.  In applying that provision, the *Remand Results* describe the second supplemental questionnaire response's description of Agro Dutch's arrangement with Customer A as "not satisfactory" because it "demonstrated that Agro Dutch's previous responses [had been] misleading and unreliable with respect to the terms of sale with Customer A, including the sale dates and payment dates" for Sets X, Y, and Z sales.  *Remand Results* at 11, 13, 15.  The *Remand Results* call specific attention to the fact that Agro Dutch reported in its initial questionnaire response that its standard terms of payment were 90 days whereas it stated in its second supplemental questionnaire response that "it would have been more accurate to state that the terms of payment were payment in advance" for Customer A.  *Id*. at 8 (quoting PDoc 142).  The *Remand Results* insist that "Agro Dutch misled the Department by stating flatly at page C-12 of [its initial questionnaire response] that '[a]ll of our sales are made [with] payment terms of 90 days after bill of lading date[.]'"  *Remand Results* at 11.

It is arguable whether Commerce can reasonably claim to have been "misled" when the initial questionnaire requested "terms of payment" information and in response Agro Dutch stated what its

---

[1] (...continued)
satisfactory response to a deficiency notice obviates consideration of the response in accordance with section 1677m(e).

standard or nominal terms of payment are.  In addition, Agro Dutch provided data showing advance

payments from Customer A as part of its initial questionnaire responses.[2]  In light of such data

elsewhere in the record, at best Commerce could claim Agro Dutch's specific responses had needed

clarification and had therefore been "deficient," but the record shows that Commerce did not ask

specifically for clarification of observed discrepancies between actual payment and terms of payment

in its first supplemental questionnaire, it only requested clarification of "commissions."[3]  Agro Dutch

did, however, volunteer a clarification when it responded to the petitioner's comments.  That

amounted to an opportunity to remedy the deficiency, and Agro Dutch also provided a more

complete explanation thereof subsequently.  Commerce's stated reasons for its dissatisfaction with

Agro Dutch's explanation are therefore untenable.

    In any event, Commerce's foregoing analysis of Agro Dutch's second supplemental

questionnaire response was not a proper application of 19 U.S.C. § 1677m(d).  Commerce did not

consider or evaluate the information contained therein on its own merits but instead used the

information in an attempt to defeat Agro Dutch's earlier responses.  That defeats the remedial

purpose of section 1677m(d) to provide notice of deficiency and the opportunity to correct it.

Commerce's analytical flaws are discussed in greater detail as follows.

---

[2]  For Commerce to claim from such circumstance that it had been "misled" at the outset would amount to an abdication of its analytical responsibilities. *Cf.* Antidumping ("AD") Manual, Ch. 5 at 8 (Dep't of Comm., ITA, Import Administration) (confounding "payment terms" when admitting that "[c]laims for differences in credit costs must be based on actual payment experience rather than nominal payment terms").

[3]  "Commissions are payments to parties providing services that relate to the sale of merchandise." *Id.* , Ch. 5 at 29.

A

The *Remand Results* state that complete information pertaining to Agro Dutch's arrangement with Customer A was lacking on the record, such that the Sets X, Y and Z sales could not be fully analyzed. Information was lacking, according to the *Remand Results*, because the second supplemental questionnaire response revealed "for the first time" that other customers pay Customer A for their purchases rather than Agro Dutch, and therefore "threw into doubt" Commerce's "previous assumptions concerning the nature of U.S. sales as EP sales" and "raise[d] more questions than it answer[ed.]" Specifically, the *Remand Results* state that "Agro Dutch did not fully answer previous questions posed in the initial questionnaire and the August 9, 2001, supplemental questionnaire concerning its commission agreement with Customer A and the terms under which it received commissions." *Remand Results* at 8. That is, Agro Dutch "did not explain how or why its letter of credit was discounted on certain sales," *id.*, and Customer A's role as collection agent, commissionaire and consignee for some of Agro Dutch's sales to other customers "may indicate a relationship equivalent to affiliation" or a degree of involvement in the sales process that requires further analysis to determine whether Customer A transacted CEP sales and the extent of its involvement in the "sales negotiation process." *See Remand Results* at 8-9. As to the Set Z sales, the remand results state that application of adverse facts available to these sales obviated consideration of whether use of the reported payment date was appropriate for calculating imputed credit expense in the final results. *Remand Results* at 9.

At this point, it becomes apparent that the *Remand Results* confound proper analysis of Agro Dutch's second supplemental questionnaire response with analysis of the evidence of record as a

whole, because the points raised concern information provided for the record much earlier in the proceeding than the second supplemental questionnaire response.   A response necessitating further explanation is, by definition, deficient, but the second supplemental questionnaire did not request explanation of how or why Agro Dutch's letter of credit was discounted on certain sales, nor did it ask for additional information related to a commission agreement with Customer A. The only apparent fact the second supplemental questionnaire response clarifies is with respect to invoices already provided to Commerce earlier in the proceeding and on which Customer A is reflected as the consignee.  The explanation provided in the second supplemental questionnaire indicated that for sales Agro Dutch made to certain customers it settled the account receivable balance by a corresponding reduction in the security-payment or advance-payment liability being maintained with respect to Customer A, in effect transferring the account receivable balance owed from such other customer to Customer A.  The only obvious impact such a clarification ought to have is with respect to the so-called Set Z sales, and Commerce does not adequately explain why this clarification is fatal to export price analysis of *all* sales involving Customer A (Sets X, Y and Z sales).   Commerce merely implies that this is so. *Cf. Remand Results* at 11 ("particularly for those sales where other customers paid Customer A").  Nonetheless, Commerce apparently felt justified in concluding from Agro Dutch's second supplemental questionnaire response that it was proof of Agro Dutch's earlier "withholding" of information, and that such circumstance was sufficient to cause it to doubt Agro Dutch's explanation of the entire arrangement between Agro Dutch and Customer A and prevented determination(s) of the date of sale and/or date of payment in respect of all sales involving Customer A.  The court, however, discerns no contradiction, only clarification, between Agro Dutch's earlier

responses and the second supplemental questionnaire response concerning Agro Dutch's

arrangement with Customer A and concerning the reported dates of sale and reported dates of

payment. *Cf. World Finer Foods, Inc. v. United States*, 24 CIT 541, 550 (2000) (unreasonable to

conclude a submission contained new factual information, although it involved factual or

methodological change, where respondent claimed clerical error and sought to correct record).

Regarding date of sale, the only indication on the record of Commerce's understanding of

what "agreement(s) for sales in the United States" encompasses is reflected in the glossary of terms

accompanying the initial questionnaire, which explains that the "date of a sale" is normally the

invoice date unless Commerce is "satisfied that a different date better reflects the date on which the

exporter or producer established the material terms of sale (*e.g.* price, quantity)." PDoc 20, App. I

at I-5 (referencing 19 C.F.R. § 351.401(i)). *See Remand Results* at 2. According to Commerce's

antidumping manual, "the date of the invoice is the presumptive date of sale, although this

presumption may be overcome." AD Manual, Ch. 8 at 7. In other words, "date of sale," normally

presumed to be the invoice date, is that date on which all material terms of sale are agreed. Once

determined, the date of sale must be used consistently. *See*, *e.g.*, *Mittal Steel Point Lisas Ltd. v.

United States*, 31 CIT __, 502 F.Supp.2d 1345 (2007) (Commerce conceding that it was inconsistent

to use the date of shipment as the date of sale for purposes of determining imputed credit expenses

while using the date of invoice as the date of sale in other contexts of the proceeding). The *Remand

Results* also state that "[w]hile the Department normally relies on invoice date as the date of sale,

a different date may be appropriate if an agreement exists between the respondent and the customer

which establishes the key terms of sale – price and quantity – prior to invoicing. S*ee* 19 CFR

351.401(i)." *Remand Results* at 2.  But, Commerce does not point to any information of record to contradict Agro Dutch's explanation that its arrangement with Customer A did not amount to an "agreement . . . which establishes the key terms of sale," it does not adequately explain why the second supplemental questionnaire response created such uncertainty as to overcome the presumption that the invoices for the Set X, Set Y or Set Z sales constituted the date of their respective sales, and it did not determine that the information of record sufficed to establish the date of sale for purchases pursuant to Agro Dutch's arrangement with Customer A as the date the arrangement was agreed.

Regarding date of payment, Commerce's stated preference according to its antidumping manual is to use actual rather than imputed credit cost information if it is available.   *See* AD Manual, Ch. 8 at 19.  Date of payment is important for determining, *e.g.*, the proper exchange rate that should be applied to the analysis of a respondent's transactions or for determining credit expenses,[4] but the record here is of "payment" of funds that Agro Dutch already possessed.  Advance payments are the inverse of credit expenses in that they result not in credit by the respondent but in money to the respondent – and negative credit observations – but, in any event, the disclosure of that circumstance in this instance ought to have impacted only the Set X and Set Z sales, not the Set Y sales.  For that matter, Commerce does not explain why "the date the customer paid Customer

_____

[4] *See, e.g.*, *Viraj Group, Ltd. v United States*, 343 F.3d 1371, 1377 (Fed. Cir. 2003); *NTN Bearing Corp. of America v.  United States*, 26 CIT 53, 67-70, 186 F. Supp.2d 1257, 1273-75 (2002); *Mitsubishi Heavy Industries, Ltd. v. United States*, 23 CIT 326, 330-32, 54 F. Supp.2d 1183, 1188-90 (1999).   *Cf.* 19 C.F.R. § 351.410 (circumstances of sale adjustments).  A sale may be deemed aberrant and excluded from analysis if too much time elapses between the date of sale and the date of payment.  *See, e.g, Tianjin Tiancheng Pharmaceutical Co., Ltd. v. United States*, 29 CIT ___, ___, 366 F.Supp.2d 1246, 1258-61 (2005).

A[  ]or the date Agro Dutch credited that customer's accounts receivable balance" are rational

choices for determining the exchange rate and imputed credit expense, as opposed to the record

evidence of the actual date of payment, which is when Agro Dutch actually received the funds, nor

does Commerce otherwise explain what information contradicts the information of record.  That is,

Commerce does not explain why the "new" disclosure of payments owed from other customers to

Agro Dutch and transferred to Customer A necessarily and materially altered the determination of

imputed credit in the context of funds that have been received in advance and that may subsequently

be deemed "payments" for merchandise transacted.  Insofar as the court can discern, the agreed

settlements of those accounts would have had no apparent impact on Agro Dutch's cash account, nor

can the court discern any impact on the relevant terms of sale, for purposes of antidumping analysis,

involving customers affected by a transfer of the payee from Agro Dutch to Customer A.

Further, it is erroneous to characterize this as "the first time" the matter was disclosed, since

Agro Dutch, in response to previous requests for information, had already provided information for

the record to show that Customer A was a "consignee" on certain sales and therefore, in the use of

such term, implicated the receipt of payment from other customers for such sales.  The fact of the

matter is, for Agro Dutch internally it was merely a matter of bookkeeping to transfer an account

receivable to Customer A.  Commerce does not explain why, but it appears to conclude that, the

mere act of collection agency on the part of Customer A (which had been previously disclosed, albeit

indirectly) is sufficient to transmogrify an apparent product development agreement between Agro

Dutch and Customer A into something other than as represented by Agro Dutch. *Cf.*, *e.g.*, 19 U.S.C.

§ 1677(33) (definition of "affiliated persons").  Substantial evidence therefore does not support the

conclusion that Agro Dutch's second supplemental questionnaire response was a "wholesale revision" of what Agro Dutch had previously provided for the record.

Certainly an interested party has an obligation to create an accurate record and to provide Commerce with requested information in order to ensure the determination of an accurate dumping margin. *See*, *e.g.*, *Yamaha Motor Co., Ltd. v. United States*, 19 CIT 1349, 1359, 910 F.Supp. 679, 687 (1995) (referencing *Chinsung Indus. Co., Ltd. v. United States*, 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989)). But, Commerce also has the duty of administering the proceeding properly and fairly, and agency action can only be upheld on the basis articulated by the agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). Again, to the extent practicable, Agro Dutch was to be allowed the opportunity to remedy or explain any deficient response pursuant to section 1677m(d). If Commerce was unclear as to the invoices or information Agro Dutch submitted or needed further information concerning consignment and commission relationships, then it was incumbent upon Commerce to ask relevant questions upon receipt of such information. If, following the second supplemental questionnaire response, information was still missing and necessary to the proceeding, then Commerce must resort to facts otherwise available. It could also seek to fill the gap by sending Agro Dutch an additional supplemental questionnaire with precise questions to address such missing and necessary information. Regardless, if there remained, following the second supplemental questionnaire, a misunderstanding as to the information conveyed by the time of the final determination, the responsibility therefor can hardly be said to have been solely that of Agro Dutch. *Cf. China Kingdom Import & Export Co., Ltd. v. United States*, 31 CIT ___, ___, 507 F.Supp.2d

1337, 1363 (2007) (Commerce bearing responsibility for the "unsatisfactory state of the record" due to failure to comply with § 1677m(d)).

B

As mentioned, Commerce did ask for clarification of Agro Dutch's commission arrangements in the first supplemental questionnaire. If Commerce implicitly determined that the first supplemental questionnaire response had been "not satisfactory" in response to questions concerning the letter of credit and commission arrangements, that did not end Commerce's analytical obligation. Commerce either should have asked for clarification in its second supplemental questionnaire, or else it should have conducted an analysis of the first supplemental questionnaire response pursuant to 19 U.S.C. § 1677m(e). It does not appear that Commerce did either. The second supplemental questionnaire asked for a detailed explanation of the sales and payment terms for transactions involving payment advances, whether any written contract or agreement exists regarding Customer A, and an explanation of the "apparent contradiction" between the payment terms described for Customer A in the February 11th submission and the earlier statement that all of Agro Dutch's U.S. sales are made with payment terms of 90 days. It did not ask for further information regarding the letter of credit or consignments or commissions. From the fact that Commerce sent out a second supplemental questionnaire at all, the court concludes that it is indication that the information sought amounted to the sum and substance of what Commerce regarded as the deficiency of Agro Dutch's response(s) at that point in time, *i.e.*, that Commerce did not regard the first supplemental questionnaire response as deficient as to the information provided therein via Agro Dutch's explanation of its commission arrangements.

Agro Dutch's second supplemental questionnaire response appears to have complied with the information requested insofar as the information requests were framed by Commerce. "Deficiency" in 19 U.S.C. § 1677m(d) presumes clarity in the original question asked. The same is true with respect to a proper determination of "not satisfactory" regarding a response to a deficiency notice: the propriety of the determination depends upon the clarity of the question asked. A complete answer that is responsive to the question asked but which does not answer the question Commerce (erroneously) assumes it had asked cannot lawfully be considered the respondent's "deficiency" or a "not satisfactory" remedial response thereto. *Cf. Olympic Adhesives v. United States*, 899 F.2d 1565 (Fed. Cir. 1990) (under predecessor statute to facts otherwise available, a failure to comply with a request for information must be evaluated in the context of the request before an adverse inference may arise). The record does not show, and Commerce does not otherwise suggest, that Agro Dutch's second supplemental questionnaire response was incomplete or that Agro Dutch had been non-cooperative with respect to the questions asked. The record therefore does not contain substantial evidence to support the conclusion that Agro Dutch's second supplemental questionnaire response was "not satisfactory" in accordance with 19 U.S.C. § 1677m(d), and the matter must be remanded so that Commerce may make an accurate determination on the record with respect to it.

C

Nonetheless, Commerce maintains it did not have all the information it needed to properly determine what the appropriate date of sale should be or what payment date should be used for calculating imputed credit "unless it accepted Agro Dutch's methodology." *See generally Remand*

*Results* (referencing *inter alia* Initial Questionnaire Response §§ A at 10-12, CD at C-11, C-12, C-24). A finding that a respondent "withheld" information or "significantly impeded" the proceeding necessarily presumes that Commerce was hindered from obtaining *necessary* information for the record and that the information is *missing* from the record. Quite simply, there must be a gap in the record that requires filling in order to justify resort to facts otherwise available. Information must therefore be "necessary" to and "missing" from the proceeding in order for there to be a failure on the part of a respondent to comply with a request therefor. *See* 19 U.S.C. § 1677e(a). The Statement of Administrative Action accompanying Pub.L. 103-465 states that "[w]here a party has not cooperated, Commerce . . . may employ adverse inferences *about the missing information* to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." H.R. Doc. No. 103-316 (1994) at 870, *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4199 (and as italicized in *Gerber Food (Yunnan) Co., Ltd. v. United States*, 29 CIT ___, ___, 387 F.Supp.2d 1270, 1287-88 (2005)). In any event, a finding that a respondent "withheld" information or "significantly impeded" the proceeding is subject to subsection m(d).

During the proceeding, Commerce asked certain questions and received certain answers to those questions. In particular, as discussed, Commerce received apparently complete answers to its final supplemental questionnaire. Once again, if Commerce needed further information, it could simply have asked for it, or substituted facts available, but on this record, it cannot justifiably punt and then claim that Agro Dutch was responsible for the record's state. *Cf. China Kingdom*, *supra*. In the end, Commerce merely implies that information is missing from the record without stating specifically *what* information was necessary to and missing from the record. The *Remand Results*

merely state that complete information concerning Agro Dutch's arrangement with Customer A,

including an accurate description of the crediting of sales to other customers against Customer A's

advances, was necessary for a proper determination of the dates of sale and the dates of payment;

however, they then state that Ago Dutch's disclosure of such information (that other customers pay

Customer A for the purchases rather than Agro Dutch) caused Commerce to wonder whether Agro

Dutch's relationship with Customer A was "equivalent to affiliation" and to further speculate about

the extent of Customer A's involvement in the sales negotiation process with other customers in the

United States – all of which "required further examination" in order to determine whether those sales

constituted EP or CEP sales because of Customer A's role as collection agent, commissionaire, and

consignee for some of Agro Dutch's sales to other customers.  *See Remand Results* at 8-9.

     As previously noted, Commerce never determined whether Agro Dutch's arrangement with

Customer A amounted to a "long term or multi-purchase agreement," but the determination would

not have affected Agro Dutch's claim that all of its sales were export price sales in any event.

Further, Agro Dutch stated that it was not affiliated with Customer A, and it provided apparently

complete responses to the questions asked in the second supplemental questionnaire, including the

explanation that some other customers paid Customer A for their purchases rather than Agro Dutch.

Commerce characterizes this arrangement as involving collection *agency*, but Agro Dutch was

already in possession of the funds to which such agency purportedly pertained.  Whatever collection

"agency" transpired between Customer A and Agro Dutch's other customers would seem, insofar

as this court can discern, irrelevant to that circumstance.  More importantly, when all was said and

done, *Commerce itself* recognized that "the record information does not support th[e] conclusion"

that the sales should be treated as constructed export price sales rather than export price sales. 67 Fed. Reg. 46172 (Issues and Decision Memorandum at cmt 2). Commerce cannot disown that recognition and ground a final determination on the basis of mere speculation – that the sales might really be CEP sales – ostensibly substituting for facts otherwise available. *Cf. Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351-52 (Fed. Cir. 2006).[5] Furthermore, not only do the *Remand Results* not state what is incomplete about Agro Dutch's responses to the questions asked, they essentially concede that necessary information was *not* missing from the record when the final results were issued. *See, e.g., Remand Results* at 13 ("with respect to the Set Z sales, Agro Dutch withheld information[, . . . and a]s with the Set X and [Set] Y sales, it was not until the [second supplemental questionnaire response] that *Agro Dutch provided the information*") (italics added).

III

Similarly, the record is devoid of substantial evidence to support an adverse inference in the selection of facts otherwise available pursuant to 19 U.S.C. § 1677e(b). The ability to draw an adverse inference depends upon (1) the necessity of using facts otherwise available and (2) a

---

[5]     As a matter of language, substantial evidence would seem to be an adequate expression of law. The difficulty comes about in the practice of agencies to rely upon (and of courts to tacitly approve) something less–to rely upon suspicion, surmise, implications, or plainly incredible evidence. It will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action as a matter of law.

*Nippon Steel*, 458 F.3d at 1351-52 (quoting S. Rep. No. 752, 79th Cong., 1st Sess. 28, 30-31, as quoted in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 484 n.17 (1951)).

respondent's behavior during the proceeding that led to such necessity. *Cf. Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (failure to fully respond must be due to failure either to keep and maintain all required records or to put forth maximum efforts to investigate and obtain the requested information from records); *NSK Ltd. v. United States*, 28 CIT 1535, 1569-70, 346 F.Supp.2d 1312, 1342-43 (2004) (upholding use of adverse inference after two specific requests for information in response to which respondent NTN did not provide useable data), *aff'd*, 481 F.3d 1355, 1361 (Fed. Cir. 2007); *Mannesmannrohren-Werke AG v. United States*, 23 CIT 826, 839, 77 F.Supp.2d 1302, 1313-14 (1999) (Commerce must "articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation") (citation omitted). Here, Commerce has not justified resort to facts otherwise available as a result of Agro Dutch's responses, let alone an adverse inference in the selection thereof. Mere insufficiency in a response or the mere absence of necessary information on the record is not sufficient to show that a party has not cooperated to the best of its ability, Commerce must point to evidence of record demonstrating "circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made, *i.e.*, . . . circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at 1382. *Cf. Olympic Adhesives*, *supra*.[6]  Further, the adverse

---

[6] Commerce may not penalize a respondent for a failure to respond in any event. *See*, *e.g.*, *Fratelli De Cecco di Filippo Fara San Martino S.p.A. v. United States*, 216 F.3d 1027, 1033 (Fed. Cir. 2000) (Commerce cannot impose an "unjustifiably high, punitive rate" pursuant to 19 U.S.C. § 1677e(b) that ignores facts discovered in the course of its own investigation). Commerce may only use an adverse inference when resort to facts otherwise available is required. *See*, *e.g.*, *Ta Chen Stainless Steel Pipe, Inc.*, 298 F.3d at 1340 ("[i]t is clear . . . that [Congress] intended for an adverse
(continued...)

inference provision, subsection 1677e(b), is subject to the applicability of the facts-available provision, subsection 1677e(a), which in turn is subject to subsection 1677m(d). Hence, it is only *after* application of subsection 1677m(d) and, if applicable, subsection 1677m(e), that a determination of non-cooperation could be made, but the record here does not support the determination that Agro Dutch was non-cooperative when that determination was made. The only "withholding" of record was obviated by the apparent completeness of Agro Dutch's response to the second supplemental questionnaire.

### Conclusion

This matter must again be remanded for redetermination of Agro Dutch's antidumping duty margin in accordance with this opinion and based on the facts of record with respect to the affected sales involving Customer A. If Commerce determines that the record evidence is not sufficient to answer whether Customer A is affiliated with Agro Dutch or to answer the extent of Customer A's supposed "involvement in the sales process" of Agro Dutch's sales to other customers for which Customer A received payment, then Commerce shall either reopen the proceeding for the limited purpose of obtaining satisfactory answers to those questions, or it shall make its determination on the basis of facts available without imputing an adverse inference on the record evidence obtained thus far. Commerce shall file the results of this remand within forty days of the date of this opinion;

---

[6] (...continued)
facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance").

Court No. 02-00499                                                    Page 26

all parties may submit comments to the remand results within 15 days of filing; and all parties may

file responses to any such comments within 10 days after the submission thereof.

**SO ORDERED**.


                                        /s/  R. Kenton Musgrave
                                        _____
                                        R. KENTON MUSGRAVE, SENIOR JUDGE

Dated: December 26, 2007
         New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                        Deputy Clerk